JAMES COSGROVE & others[1] *vs.* MARY VERNA HUGHES.[2]

No. 10-P-338.

Suffolk. November 5, 2010. - February 15, 2011.

Present: LENK, VUONO, & RUBIN, JJ.

*Devise and Legacy,* Intestacy, Child born out of wedlock. *Paternity. Practice, Civil,* Summary judgment.

In a civil action brought in the Probate and Family Court by the plaintiff nieces and nephews of a decedent who died intestate, seeking a judgment declaring that the defendant administratrix was not the decedent's daughter and therefore not an heir entitled to take under the intestacy statute, G. L. c. 190, § 7, a judge properly granted the defendant's motion for summary judgment, where, although a genuine issue of fact existed as to whether the defendant was the decedent's biological child, such an issue was not a material fact under the intestacy statute [743-746]; where an affidavit sworn to by the decedent sufficed, within the meaning of the intestacy statute, as an acknowledgment that the defendant was the decedent's child [746], and none of the evidence in the record raised a genuine issue of fact as to whether the decedent's signature on the affidavit was knowing and voluntary [746-747]; and where the defendant was not required to establish paternity by bringing an action to obtain a judgment of paternity under the intestacy statute, given that the administratrix did not contest paternity [747-748].

CIVIL ACTION commenced in the Suffolk Division of the Probate and Family Court Department on January 6, 2009.

The case was heard by *E. Chouteau Levine,* J., on a motion for summary judgment.

*Charles P. Kindregan* for the plaintiffs.

*Hanson S. Reynolds* for the defendant.

RUBIN, J. This case presents issues concerning the nature of

---

[1]Adam DeSanctis, Jason DeSanctis, Jo-An DeSanctis, Melinda DeSanctis, Paul DeSanctis, Lorraine Felzani, Patricia Poor, Judith Viera, Laurence Viera, and Leonard Viera.

[2]Mary Verna Hughes is being sued individually and as administratrix of the estate of Louis R. DeSanctis.

"acknowledgment" under the intestacy statute, G. L. c. 190, § 7, as amended through St. 1993, c. 460, § 59, which provides in relevant part that:

> "A person born out of wedlock whose parents have inter-married and whose father has acknowledged him as his child or has been adjudged his father under chapter two hundred seventy-three, chapter two hundred and nine C or under similar law of another jurisdiction shall be deemed legitimate and shall be entitled to take the name of his parents to the same extent as if born in lawful wedlock. If a decedent has acknowledged paternity of a person born out of wedlock or if during his lifetime or after his death a decedent has been adjudged to be the father of a person born out of wedlock that person is heir of his father . . . ."

We must decide whether biological paternity is a prerequisite to an "acknowledgment" of paternity under the statute, whether other heirs may contest the biological paternity of one whose paternity has been acknowledged by an individual who died intestate, and whether the evidence at issue in this case suffices to demonstrate acknowledgment as a matter of law.

I.

A. *Background facts: Lou DeSanctis.* The summary judgment record shows the following: Louis R. DeSanctis (Lou) was born in his parents' residence in East Boston on October 17, 1914. His birth certificate reveals that his parents were both born in Italy and at the time of his birth his father was a laborer. After Pearl Harbor, in February, 1942, when he was 27, Lou submitted an application to join the U.S. Navy. He served until April 20, 1945, when he was discharged. The plaintiffs are all nieces and nephews of Lou — though not all his nieces and nephews are among them — and according to affidavits from some of them, other than going to Florida for four to six weeks in the winter where, he apparently told his family, he stayed in a rooming house, Lou lived in Massachusetts, primarily in Revere, the rest of his life. For many decades Lou was in a long-term relationship here with Evelyn Ayres. Indeed their relationship was such that when they executed a deed in 1966 transferring

property to Edward and Suzanne Ayres, Evelyn's son and daughter-in-law, they referred to themselves as "husband and wife." There is also affidavit evidence that after Evelyn's death in 1978, he seriously dated a woman named Joan Godfrey.

Before World War II, Lou had his own general contracting concern. Affidavit evidence indicates that between 1963 and the time of his death, Lou had three active businesses: Acme Plaster and Drywall, a subcontractor in the building trades that employed as many as fifty people; Day Square Builders Supply, a retail and wholesale hardware building supply store in East Boston; and two airport "park and fly" operations in East Boston, with a total of four hundred and fifty licensed parking spaces. He owned other properties in East Boston, which he rented primarily to airfreight operators serving Logan Airport. On August 25, 2008, Lou died intestate.

B. *Lou's estate, Verna Hughes, and the initiation of this lawsuit.* Evidence in this case indicates that at the time of Lou's death his estate was worth an estimated $32,035,213.86. In September, 2008, Lou's sister, Lydia C. Bevis, filed for and was appointed the administratrix of Lou's estate. In November, 2008, Lydia voluntarily withdrew as the administratrix to allow for the appointment of Mary Verna Hughes, formerly known as Mary Verna DeSanctis (Verna), then aged 77 and the defendant in this case.

Verna's birth certificate states that she is Lou's daughter. It also states that Lou had a wife, Olive DeSanctis, who was Verna's mother. The affidavit testimony of some of Lou's relatives gives a flavor of their reaction to Verna's appearance:

Lou's niece, plaintiff Jo-An DeSanctis, who was born in 1952, and knew Lou her entire life, testified that "[i]n all of the years I have known Lou he has never said to me that he was married or had a child." Lou's nephew, plaintiff Paul DeSanctis, stated that "[i]n all my years of knowing Lou . . . Lou never mentioned to me that he had a child. I never heard anyone, including Lou, say that Lou was married or had a child. It was a complete shock to me when I hear that after Lou died a woman named Verna came forward to claim that she was his daughter." His niece, Mary A. Skogebo, testified that "[p]rior to this litigation, I never heard of

Verna DeSanctis or Olive DeSanctis. I was shocked to hear Verna DeSanctis' claim that she was Lou's daughter." His nephew, plaintiff Lawrence Viera, was born in 1945 and began working with Lou washing dishes in the Neptune Diner when he was twelve years old. He stated that he knew Lou his entire life and "[i]n the many years that I knew Lou, he never mentioned or introduced me to anyone named Olive or Verna." His niece, plaintiff Judith Viera, testified that she had worked for Lou as his housekeeper for thirty years, from 1964 to about 1995, and that "[i]n all the years I have known Lou he has never said to me that he had a child. Nor did I ever see anything in Lou's office or apartment suggesting that he had a child. There were no photographs or memorabilia. Nor did I ever see any mail suggesting he had a family."

On January 6, 2009, the plaintiffs brought this action in the Probate and Family Court against Verna individually and as administratrix of Lou's estate seeking a declaratory judgment that Verna is not Lou's daughter and that therefore, under the laws of intestacy, she is not an heir and may not inherit from his estate.

The evidence developed in this case makes clear, and there is now no doubt, that, unbeknownst to his family, Lou was in fact not only married to Olive DeSanctis in the 1940s, but remained married to her for sixty-two years, from August 29, 1944, until her death in 2006. The record contains a certificate of marriage from the State of Rhode Island showing that Lou and Olive Marie Deveau, born in Nova Scotia on July 8, 1909, were married in North Kingston, Rhode Island on August 29, 1944. It also contains copies of joint State and Federal tax returns from the 1980s, the 1990s, and as recently as 2001, filed in the name of Louis R. and Olive M. DeSanctis, giving as their address a house in Miami, Florida; it appears that Olive lived in this house and that it was titled in Lou's name.

There is also no dispute that Verna was born prior to Lou and Olive's marriage, on August 12, 1931. Olive was then 23 and working as a housemaid and living in East Boston. Lou was 16.

On October 8, 1944, months after their marriage, Lou and Olive swore a "deposition" — essentially an affidavit — before a notary public asserting that the birth record relating to Mary Verna Deveau "does not fully and correctly state all the facts

relating to said birth." It identified Lou and Olive as Verna's "natural parents." A correction of Verna's record of birth was filed on the basis of that affidavit, listing Louis R. DeSanctis as the father. Verna's certified birth certificate, which is based on that document, also states that her father is Louis R. DeSanctis and that the maiden name of her mother is Olive M. Deveau.

The Probate and Family Court judge found as a matter of law that this was an "acknowledgment" that Verna was Lou's child and thus granted her motion for summary judgment.

## II.

A. *Standard of review.* We review the judge's order granting summary judgment under the familiar standard: We view the evidence in the summary judgment record in the light most favorable to the nonmoving party, in this case the plaintiffs, and we review de novo the judge's conclusion that summary judgment was appropriate. See *Gray* v. *Giroux*, 49 Mass. App. Ct. 436, 438 (2000). Summary judgment lies when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56(b), as amended, 436 Mass. 1404 (2002).

B. *Does the effectiveness for purposes of intestacy law of an acknowledgment of paternity depend upon whether the child is in fact the father's biological child?* The plaintiffs' primary argument is that even if the sworn deposition is a valid "acknowledgment" within the meaning of § 7, Verna nonetheless may not inherit under the intestacy statute unless she is Lou's biological child.

The record may be viewed to raise a genuine issue about whether Verna is Lou's biological child, a factual question on which we express no opinion. Indeed, the evidence could give rise to a variety of reasonable inferences about the matter. The record includes a September 15, 1931, "return of birth" that was unsigned but that recorded Verna's birth in 1931. It appears originally to have stated that her full name was Mary Verna Muiz. It described her father as a twenty-four year old fisherman named Joseph, and listed her mother as Anna Deveau. The document further stated that both the father and the mother were born in Nova Scotia.

There is a notation across the return, apparently written by someone at the Massachusetts Registry of Vital Statistics on December 15, 1931, which reads, "Mother at office says this child is illegitimate. Went to Dr. for a corrected certificate." The signature line is signed by Anna Deveau, and after her signature the return states in parentheses "Dec. 15, 1931."

Verna's standard certificate of birth, preserved in the records of the Registry of Vital Statistics, was signed the next day, December 16, 1931, by the doctor who attended her birth. It lists her full name as Mary Verna Deveau, and the maiden and present name of her mother as Mary Anna Olive Deveau. None of the lines for information about Verna's father contain any information; each is stricken through with a straight horizontal line.

A letter from Saul Marcus, M.D., written in July of 1943, before Olive and Lou married, refers to "Mrs. Olive DeSanctis" as his patient and seeks Lou's transfer from a Navy posting in the Aleutian Islands to the East Coast because of Olive's active tuberculosis. It states "it would be a great help to have Mr. De-Sanctis on the east coast to supervise the welfare of both his wife and child."

By contrast, in November 1944, Lou swore out a "Beneficiary Slip," in which he listed as beneficiaries in case of his death, Olive, whom he described as his "wife," and "Verna DeSanc-tis," whom he described as his "step-daughter." On that same date, he listed Olive and Verna the same way on a form requesting a family monetary allowance. On the other hand, in a letter seeking discharge from the Navy in March, 1945, he wrote, "I am married to Olive DeSanctis, and we have one child, Verna, age 13." Elsewhere in the submission he referred to her as "our daughter." There is also testimony in the plaintiffs' affidavits that Lou said that his one regret in life was not marrying and having children.

These various pieces of evidence could support either conclusion about whether Lou was Verna's biological father, particularly when one reads them, as one must, against the backdrop of the shame and stigma for both mother and child attendant at the relevant times upon out-of-wedlock birth.

Summary judgment must be denied on the basis of a genuine issue of fact, however, only where that fact is *material*. The

plaintiffs argue that whether Lou was Verna's biological child is material under § 7, because one cannot "acknowledge" a child that is not his biological child. They contend that "[t]he statutory scheme for intestate inheritance is premised upon the bedrock principle that the estate of a deceased person should pass to the actual *biological* kin of the deceased." They argue that in light of this principle, if someone in Lou's position marries a woman with a child born out of wedlock that is not his, that child may become his own for purposes of intestate inheritance only through adoption.

We see no such bedrock principle in intestacy law. The plaintiffs have pointed to no case in which a court has divested a child born *during* marriage of his or her status as an heir on the basis that he or she was not the biological child of the decedent. And the law clearly reflects the reality that being a parent to a child does not necessarily require biological parenthood: adopted children are treated no differently than biological children. See G. L. c. 210, § 7. Although the plaintiffs point repeatedly to statutory and case law concerning support obligations, custody, and visitation, the issues at stake in those contexts — which may include, for example, determining what is in the best interests of a minor child, attempts to avoid financial responsibility for a child, and questions about an individual's fundamental rights regarding child-rearing — are dramatically different from those in an intestacy proceeding, in which the question is whether someone should be treated as a child in determining whether he or she may inherit.

Section 7 provides, "If a decedent has acknowledged paternity of a person born out of wedlock . . . that person is heir of his father." Its text provides no basis for allowing other relatives greater authority to challenge the biological relationship to his or her intestate father of a child born out of wedlock and acknowledged under the statute than would be permitted with respect to a child born during the marriage of that father.[3] For

---

[3]In *Lowell* v. *Kowalski*, 380 Mass. 663, 670 (1980), the Supreme Judicial Court ruled that the requirement for establishing paternal inheritance rights that an out-of-wedlock child's parents must marry after birth even when the father had acknowledged the child as his own was unconstitutional. We note that no constitutional challenge is brought before us relating to any aspect of § 7.

purposes of § 7, it is irrelevant whether there is a genuine issue with respect to that question. Under the statute, whether Verna is Lou's biological child is therefore not a material fact, and the plaintiffs' argument provides no basis for disturbing the judge's order granting summary judgment.[4]

C. *Is there a genuine issue about acknowledgment?* The plaintiffs next argue that there is a genuine issue as to whether Lou "acknowledged" Verna as his child within the meaning of G. L. c. 190, § 7. In order to qualify as an "acknowledgment" within the meaning of the statute, "the recognition of parentage must be unambiguous." *Houghton* v. *Dickinson*, 196 Mass. 389, 391 (1907). "[N]o formal acts are prescribed by the statute which shall constitute the acknowledgment required," and "such recognition may be shown by conduct as well as by declarations . . . ." *Ibid.* These rules, which still pertain, were in place when Lou signed the affidavit in 1944.

It is clear that the sworn testimony of a father is sufficient to demonstrate the requisite unambiguous acknowledgment of a child under § 7. See *Lowell* v. *Kowalski*, 380 Mass. 663, 670 (1980). Lou's sworn affidavit of October 8, 1944, is such testimony. Given the circumstances and purposes for which that affidavit was sworn — to correct who would be listed as Verna's natural parents on her birth certificate — there was no error in the motion judge's conclusion that it sufficed as acknowledgment within the meaning of the statute. Once Lou acknowledged Verna as his child, she was his child and heir, just as if she had been born in wedlock. See G. L. c. 190, § 7. That Lou subsequently did not consistently assert that Verna was his daughter, even in a sworn listing of his beneficiaries, does not draw the sufficiency of his acknowledgment itself into question.

The plaintiffs argue that the acknowledgment contained in the affidavit was not knowing and voluntary. None of the evidence in the record, however, raises a genuine issue about whether Lou's signature on the affidavit was knowing and voluntary. The plaintiffs do argue that Lou's listing Verna as his "step-daughter"

---

[4]Moreover, because a biological relationship between Lou and Verna is immaterial to intestacy rights under § 7 when there is a valid acknowledgment, it was not error for the Probate Court judge to deny the plaintiffs' motion to compel Verna to take a deoxyribonucleic acid test.

in the sworn "Beneficiary Slip" of November, 1944, he submitted shortly after signing the affidavit demonstrates that he did not know the significance of the affidavit, but that is simply speculation. The plaintiffs have not brought forth any evidence that Lou's signature was obtained by fraud or that he signed under duress or as a result of coercion. Nor do they contend that the signature on the affidavit is not genuine.[5]

Finally, the plaintiffs contend that Verna could not establish paternity without bringing an action to obtain a judgment of paternity as described in last sentence of G. L. c. 190, § 7, as appearing in St. 1986, c. 334, § 7: "A person may establish paternity if, within the period provided under [c. 197, § 9] for bringing actions against executors and administrators, such person either (a) delivers to the executor or administrator an authenticated copy of a judgment rendered by a court of competent jurisdiction during a decedent's lifetime adjudging the decedent to be the father of a person born out of wedlock, or (b) commences, in a court of competent jurisdiction, an action in which the executor or administrator is a named party and in which such paternity is ultimately proved."

The statute clearly states that paternity may be shown either by acknowledgment or by adjudication. G. L. c. 190, § 7 ("If a decedent has acknowledged paternity of a person born out of wedlock or if during his lifetime or after his death a decedent has been adjudged to be the father of a person born out of wedlock that person is heir of his father. . . ."). Its final sentence addresses circumstances where an administrator or administratrix refuses to accept an heir's assertion of paternity and therefore it is not applicable where, as here, the administratrix did not contest paternity. See *Hunter* v. *Porter*, 57 Mass. App. Ct. 233, 237 (2003) (ruling that where administratrix of estate contested paternity, out-of-wedlock child had to commence action under § 7 even though she was claiming that there was acknowl-

[5]The plaintiffs also argue that the probate judge abused her discretion in only granting two of the plaintiffs' production requests, and thus that they were not able to effectively contest the defendant's summary judgment motion. The granted requests were the most relevant to the issue of acknowledgment, while the others were repetitive, beyond the scope of the issue of acknowledgment, or a matter of public record. Therefore, we find that there was no abuse of discretion.

edgment of paternity). In this case, where other putative heirs sought to challenge the administratrix's acceptance of the defendant's paternity, they properly brought this action in order to do so. The order granting summary judgment issued by the Probate and Family Court that we affirm today resolves the question.

*Judgment affirmed.*