## PETITION OF TWO MINORS FOR CHANGE OF NAME.

No. 05-P-120.

Plymouth. November 17, 2005. - March 31, 2006.

Present: ARMSTRONG, C.J., BROWN, & MILLS, JJ.

*Name. Probate Court,* Change of name. *Parent and Child,* Name of child.

A probate judge erred in denying a change of name petition brought by a mother on behalf of her two minor children, seeking to change the children's surname from that of the father (her former husband) to that of the stepfather (her present husband), where the judge's findings in support of his conclusion that the change of name was not in the best interests of the children suggested that the judge based his decision on consideration of several factors that lacked firm foundation in the evidence or ignored evidence to the contrary. [855-859]

PETITION filed in the Plymouth Division of the Probate and Family Court Department on July 24, 2002.

The case was heard by *Michael J. Livingstone*, J., and post-judgment motions were also heard by him.

*David Berman* for the mother.

BROWN, J. The mother (mother), the former wife of the father (father), brought a petition in the Probate and Family Court on behalf of her two minor children (children) seeking to change the children's surname from that the father to that of her present husband, the children's stepfather (stepfather).[1] After a hearing, the judge denied the request for change of name, stating that it would not be in the best interests of the children.

1. *Background.* The children were born in 1990 and 1992,

---

[1]The two minor children also signed the petition for change of name. We have noted that "[w]hether a parent or guardian may undertake to change the name of a minor child as 'next friend' of the child has not been decided." *Richards* v. *Mason*, 54 Mass. App. Ct. 568, 570 n.5 (2002). As the issue was not raised below and has not been pressed on the appeal, we do not pass upon it. See *ibid.*

respectively, and bear as their legal surname their father's last name. After the children's mother and father were divorced in 1994,[2] the mother (apparently in 1994 or 1995) married the stepfather. The children have lived with their mother and stepfather since that time, and as we shall discuss more fully, *infra*, the stepfather has played an active and substantial role in the children's lives.

At the commencement of the hearing on the petition for change of name (on March 7, 2003),[3] the judge was informed that Dr. Edward M. Powers had been appointed guardian ad litem for the children in an ancillary proceeding to investigate visitation and contact between the children and their father following an incident at a soccer game.[4] Although the mother voiced her belief that Dr. Powers's guardian ad litem report, which was due on April 10, 2003, would be "very helpful" to the judge in resolving the name change petition, the judge decided to proceed with the hearing on the merits. Thereafter, the mother, who was the only witness at the hearing, testified as to the longstanding and close relationship between the children (who were ten and twelve years of age at the time of the hearing) and their stepfather. She testified further that since 1998 the children had used their stepfather's surname in their activities,[5] that they introduced themselves to others using their stepfather's surname, and that they wanted to be referred to by

[2]The mother appears to have been awarded (at least) physical custody of the children under the divorce judgment.

[3]The father and the children were represented by counsel at the hearing. The mother proceeded pro se.

[4]The father had unsupervised visitation with the children every other weekend until an incident occurred at a soccer game on March 31, 2002. The mother testified that the father put the younger daughter, then age nine, in a headlock for the time it took to go from the back of the soccer dome to the front, which the mother estimated was about two minutes. As a result of the incident, assault and battery charges were brought against the father, who was found not guilty. The mother and both children obtained restraining orders against the father after the incident, and the father's visitation was suspended pending an investigation by Dr. Powers.

[5]The mother also stated that the children's school had allowed the children to use the hyphenated surname of the father and stepfather and that she registered the children for religious classes under the father's surname because it was a "legal document" (although the children refer to themselves at church by their stepfather's surname).

their stepfather's surname. Continuing, the mother stated that the children had no affection for the father, that they had no desire to be seen with him,[6] and that they had pressed to have their surname legally changed. The mother acknowledged that the father was up-to-date in his child support payments; that he had attempted, through the filing of court actions subsequent to the incident on March 31, 2002, to continue to have a meaningful role in the children's lives; and that he had "timely" objected to the name change petition. A letter written by Dr. Powers, dated August 26, 2001, was also introduced in evidence. Doctor Powers stated therein that although his work with the family had been limited, the father appeared to have a genuine affection for his two children and they for him, and that the father's interactions with the children "were observed to be occasions of comfortable interpersonal exchange with the children and their father enjoying each other's company, and were absent of any signs of physical discomfort or emotional distress."[7]

At the conclusion of the mother's testimony, the father moved for a "required finding," which the judge appears to have treated as a "motion for a directed verdict."

Thereafter, there was much discussion between counsel and the judge concerning, inter alia, the possible need for Dr. Powers to testify and whether the judge should reserve judgment until Dr. Powers filed his guardian ad litem report. At the close of trial, the judge informed counsel for the father: "There's no need to call your client. You did a prima facie case. Otherwise, you'd be entitled to a motion for directed verdict as you've asked for."[8]

---

[6]The mother stated that the elder child had not had a face-to-face visit with the father since October, 2001, and that the younger child had not had a face-to-face visit with the father since the incident at the soccer game. See note 4, *supra.*

[7]The August 26, 2001, letter from Dr. Powers was directed to an attorney and related to the father's visitation schedule. It makes no mention of a change in the children's surname. On cross-examination of the mother, the children's counsel elicited evidence that Dr. Powers had continued to work with the children subsequent to August 26, 2001. Counsel sought to introduce a second letter prepared by Dr. Powers and dated September 7, 2002, which was marked for identification. The second letter was directed to another probate judge and addressed the petition for change of name.

[8]In a jury-waived trial, the proper vehicle is a motion to dismiss pursuant to Mass.R.Civ.P. 41(b)(2), 365 Mass. 803 (1974).

By an order dated March 13, 2003, the judge took under advisement the questions whether to admit Dr. Powers's letter of September 7, 2002 (see note 7, *supra*), and whether to wait for Dr. Powers to file his guardian ad litem report. The judge stated further that "[b]y representation of counsel for the children, the Court understands that Dr. Powers may include in his report information concerning the children's name change petition and whether or not it is in the best interest of the children to do so."

On April 25, 2003, the judge issued a "judgment" (which also includes certain findings) denying the petition for change of name, finding that the father was current in his child support obligations for both children and continued to love and show an interest in the children, as manifested by Dr. Powers's letter of August 26, 2001, and the mother's own reluctant admission to that effect.[9] The judge did not find credible the mother's testimony that the children had no interest in spending time with the father or that the children had requested the name change (a request that, the judge indicated, would not be determinative in any event). Concluding that the mother, as moving party, had failed to meet her burden of demonstrating that it was in the best interests of the children to change their names, the judge directed the mother to correct "any and all school, religious, extra-curricular, sporting, and all other records to reflect each of the children's correct legal names . . . , and, thereafter, only [those] names shall be used with respect to each child in every instance."

The children, through their attorney, moved for reconsideration, for a new trial, and for relief from judgment, stating, through the affidavit of counsel, that the guardian ad litem's report (the relevant portions of which are set out in the margin[10]) had been timely filed and received in the Probate and Family Court on April 10, 2003. On May 29, 2003, the judge, having reviewed the

---

[9]At the outset of the judgment, the judge stated that the guardian ad litem's report, though due on April 10, 2003, had not been submitted as of the date of the judgment. The judge stated further that he would not admit in evidence Dr. Powers's letter of September 7, 2002.

[10]Dr. Powers's report dated April 5, 2003, recites:

"*Findings*:

". . .

guardian ad litem's report (which the judge stated had been timely filed in the court but not placed in the petition for change of name file) and the formerly-excluded letter of September 7, 2002 (which was incorporated by reference in the guardian ad litem's report),[11,12] issued a "further order" denying all the postjudgment motions and affirming the earlier judgment, "resta[ting] that the Court does not believe that the children's change of their surname

"(c) Reference is made to correspondence from me dated August 26, 2001 which includes my observations of the interactions between the [father] and his two children. My more recent contact with the [father] in December, 2002 included his reiteration of interest in reestablishing an ongoing relationship with both his daughters. Interviews with the two minor children revealed that neither of the children share an interest in resumption of contact with their father at this time. The younger daughter . . . is more open to the possibility of reestablishing contact with her father at some future point than is the older daughter . . . .

"(d) Reference is made to correspondence from me dated September 7, 2002 relating to the two children's expressed interest in changing their surname from [the father's surname] to that of their stepfather . . . . Both minor children remain invested in accomplishing this change, and have begun to informally represent themselves socially using the preferred surname.

"*Recommendations*:

"  . . .

"(d) Other than for the objection registered by the [father], there is no other evident and compelling reason to deny the change in surname. The children have been consistent in their advocacy for this change. The[y] identify positively with their stepfather . . . and see the change in surname as an acknowledgment of his efforts on their behalf. It therefore seems in the children's best interests that this surname change be allowed."

[11]In his letter dated September 7, 2002, Dr. Powers stated, inter alia:

"At the time of our having concluded services, both daughters were expressive of their desire to pursue a change in their surname at such time as the court would permit. Despite professional efforts to achieve a better relationship between the children and their biological father, the relationship has become more estranged as a result of further problematic incidents which have occurred. Both children appear to remain highly committed to changing their name, in part as a symbol of the positive regard they feel for their stepfather and the role he has played in their lives to date."

[12]Absent any evident objection to the judge's eventual consideration of the guardian ad litem's report or Dr. Powers's letter of September 7 (and any argument by the father, who has not filed a brief), we consider such evidence to have been before the judge for all its probative worth, even if hearsay. See *Petitions of Catholic Charities to Dispense with Consent to Adoption*, 22 Mass. App. Ct. 48, 59 (1986).

to [that of their stepfather] is in the children's best interests." The judge followed with separate and more detailed findings of fact and conclusions of law,[13] which iterate, in part, the findings intertwined in the judgment dated April 25, 2003.[14] In concluding that the change in name would not be in the children's best interest, the judge emphasized the father's "good relationship" with, and love for, the children (as evidenced, inter alia, by Dr. Powers's letter of August 26, 2001, and the mother's own testimony) and the lack of evidence to suggest that the children do not love the father. The judge further noted that the children have had the father's surname their entire lives, that "the level of their identification with the name is well established," and that there was no evidence that the children's retention of their father's surname would cause them difficulty or embarrassment. Finally, the judge, pointing to the comment in Dr. Powers's letter of August 26 that the "parents remain highly contentious toward each other," found that the mother's efforts to change the children's surname "constitutes an attempt to alienate [the] [f]ather from the children's lives," behavior that should not be condoned through a change of name petition. In the judge's view, "allowing the children to keep the last name of their natural father is an important step towards repairing the temporary estrangement of the [f]ather from the children." The mother and children have appealed.

2. *Discussion.* At common law a person could "change his name at will, without resort to legal proceedings, by merely adopting another name, provided that this is done for an honest purpose." *Richards* v. *Mason*, 54 Mass. App. Ct. 568, 570 (2002), quoting from *Merolevitz, petitioner*, 320 Mass. 448, 450 (1946). "That a change of name petition may be sought pursuant to G. L. c. 210, § 12,[15] 'does not abrogate the common law right to use a name of one's choosing. . . . It simply aids a

---

[13]We have sent for and reviewed the judge's findings of fact and conclusions of law, which *should* have been, but were not, included in the record appendix.

[14]The judge's statement in his findings of fact that he took the testimony of the father is incorrect.

[15]General Laws c. 210, § 12, as amended by St. 1977, c. 869, § 3, provides: "A petition for the change of name of a person may be heard by the probate court in the county where the petitioner resides. The change of name of a

petitioner in securing an "official record which definitely and specifically establishes his change of name." ' " *Id.* at 570-571, quoting from *Verrill, petitioner,* 40 Mass. App. Ct. 34, 35-36 (1996). We have stated that in controversies concerning the surnames of children, whether born to married or unmarried parents, the "best interests" of the child standard is applicable. *Id.* at 571 (provision in G. L. c. 210, § 12, that a petition seeking to change the name of a person "shall be granted unless such a change is inconsistent with public interests" does not displace the "best interests" standard). See *Petition of Two Minors for Change of Name,* 25 Mass. App. Ct. 941, 941 (1988); *Jones* v. *Roe,* 33 Mass. App. Ct. 660, 662 (1992). See also Kindregan & Inker, Family Law and Practice §§ 62.1 & 62.5 (3d ed. 2002); Harvey, Moriarty, & Ryan, Massachusetts Domestic Relations § 23-107 (2003).

In determining a child's best interests with respect to a proposed change in surname, a judge may consider various factors, "includ[ing] the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent and other siblings; the length of time the child has utilized a given name; the age of the child as it may relate to his or her identification with the surname; and the difficulties and embarrassment that the child may experience from bearing the present or proposed surname." *Jones* v. *Roe,* 33 Mass. App. Ct. at 664. *Richards* v. *Mason,* 54 Mass. App. Ct. at 571-572.[16] See *Mark* v. *Kahn,* 333 Mass. 517, 521-522 (1956) ("A change of name may not be in the child's best interest if the effect of such change is to contribute to the further estrangement of the

person shall be granted unless such change is inconsistent with public interests."

[16]We were mindful in *Richards* v. *Mason* that "societal views may have altered since our decision in *Jones." Richards* v. *Mason,* 54 Mass. App. Ct. at 572 n.6. "For example, embarrassment or difficulty to a child in bearing a surname that differs from that of a custodial parent may no longer be as significant a factor as it once was. Likewise, commentators have recently voiced the notion that by considering the length of time the child has used a given name (in essence a presumption in favor of the status quo), historic patterns of patronymic naming may unduly favor the father. . . . A custodial parent presumption in controversies involving the renaming of a child has gained recognition in some States." *Ibid.* We stated that "[e]ither party is free to present evidence on remand whether additional considerations should now be entertained, and others abandoned." *Ibid.*

child from a father who exhibits a desire to preserve the parental relationship"). The personal preference of a child of suitable age and maturity should also be considered. See *Richards* v. *Mason*, 54 Mass. App. Ct. at 570, 572. See also *Mark* v. *Kahn*, 333 Mass. at 521.

In the instant matter, we agree with the mother and the children that the "judgment" and "further order" denying the petition for name change must be vacated. As we have indicated, the judgment and findings suggest that the judge based his decision on consideration of several factors that lack firm foundation in the evidence or ignore evidence to the contrary, most notably the mutual love and affection between the father and the children, the children's "well established" identification with their father's surname, and the mother's efforts to alienate the father from the children's lives through the change in surname.[17] We address in turn each of these bases.

In determining that the father has a "good relationship" with the children, and that there is mutual love and affection between them, the judge seemingly relied on the father's visitation history with the children, the purported testimony of the mother that she believes the father loves the children, the absence of evidence that the children do not love the father, and the observations of Dr. Powers concerning the interactions of the father and the children as set out in his letter of August 26, 2001 (which appears also to have served as a basis for the judge's determination that the mother was not credible in testifying that the children had requested the change in name and had no interest in spending time with their father). At the outset, there is nothing in the record to support the judge's finding that the mother admitted, reluctantly or otherwise, that she believes the father loves the children. Moreover, there ultimately *was* "evidence" before the court (apart from the mother's testimony), in the form of the guardian ad litem's report and Dr. Powers's letter of September 7, 2002 (see note 11, *supra*), that the children harbor antipathy towards the father. Furthermore, and

---

[17]As to the judge's finding that the father is up to date in his support payments, i.e., that he is in compliance with his court-ordered obligations, see *Richards* v. *Mason*, 54 Mass. App. Ct. at 571, quoting from and discussing *Jones* v. *Roe*, 33 Mass. App. Ct. at 662.

importantly, the judge's findings, while quoting liberally from Dr. Powers's letter of August 26, 2001 (which was based on Dr. Powers's then-limited work with the family), fail to reflect any meaningful consideration by the court of Dr. Powers's updated (and independent) assessments of the children in the light of subsequent events, and the children's repeated statements to Dr. Powers concerning, for example, their negative attitudes toward the father, their lack of interest in resuming contact with him at the present time, and their *own* desires to change their surname.

The judge's finding concerning the children's identification with the father's surname is also problematic. Putting to one side possible issues implicated in "historic patterns of patronymic naming" (see note 16, *supra*), while it is true that the children's legal surname has been that of their father for their entire lives, the judge's findings fail to reflect (as it may bear on the question of identification) consideration of the evidence adduced at trial and contained in the guardian ad litem's report that the children generally have been using their stepfather's surname in their social activities.

Finally, while the effect of the change of a child's surname on the preservation and development of the child's relationship with each parent, and a parent's attempt, through a name change, to alienate the other parent from a child,[18] may be proper considerations for the court in determining a child's best interests, here, in the absence of adequate consideration in the findings of all relevant factors (and evidence), the judge's decision cannot stand.[19]

In light of the errors and deficiencies in the judge's findings

[18]Again, even if the judge disbelieved (as he did) the mother's testimony that the children had requested the name change, he does not address in his findings the guardian ad litem's report and Dr. Powers's letter of September 7, 2002, both of which indicate that the children themselves were highly committed to the change.

[19]The mother and children also suggest in their brief that the judgment must be reversed because under the mandatory language of G. L. c. 210, § 12, children of ten or twelve years of age, as here, should be deemed capable of deciding the name by which they wish to be called, absent evidence of coercion, fraud, bribery, emotional immaturity, or mental incompetence. They assert further that to the extent our decision in *Richards* v. *Mason, supra,* meant to hold that "when a child . . . herself petitions for change of name and is competent to make that petition the court may nevertheless deny it on

in support of his conclusion that the change in name was not in the best interests of the children, we vacate the "judgment" and the "further order" and remand the matter to the Probate and Family Court for a new hearing before a different judge. As in *Richards* v. *Mason*, 54 Mass. App. Ct. at 572 & n.6, the parties may raise on remand the appropriate considerations to be entertained by the court.

The judgment dated April 25, 2003, and the further order dated May 29, 2003, are vacated, and the matter is remanded to the Probate and Family Court for a new hearing consistent with this opinion.

*So ordered.*

---

the ground that the change is not in the best interest of the child," it was wrongly decided. In the mother and children's view, "[n]othing in § 12 refers to the best interests of the child, and by referring to the 'public interest' the Legislature virtually repudiated that standard in § 12 petitions." They also claim that reversal is required because the judge erroneously placed the burden of proof on the children in this case. None of these "issues" was raised in any meaningful way at the hearing, and indeed, the mother and children's arguments appear (in part) to be inconsistent with the theories on which the case proceeded below. See *Larson* v. *Larson*, 28 Mass. App. Ct. 338, 341 (1990). In the circumstances, and in view of the uncertainty as to what points may be pressed at the new hearing, we decline to address these questions.